## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br>100 F. Street, NE<br>Washington, D.C. 20549<br><br>Plaintiff,<br><br>v.<br><br>**JOHNSON & JOHNSON**<br>One Johnson & Johnson Plaza<br>New Brunswick, NJ  08933<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges:

### SUMMARY

1.     This matter concerns violations of the Foreign Corrupt Practices Act ("FCPA") by Johnson & Johnson ("J&J") as a result of the acts of its subsidiaries to obtain business for J&J's medical device and pharmaceutical segments.

2.     Since at least 1998 and continuing to early 2006, J&J's subsidiaries, employees and agents paid bribes to public doctors in Greece who selected J&J surgical implants for their patients.  Further, J&J's subsidiaries and agents paid bribes to doctors and public hospital administrators in Poland who awarded tenders to J&J from 2000 to 2006.  J&J's subsidiaries and agents also paid bribes to public doctors in Romania to prescribe J&J pharmaceutical products from 2002 to 2007.  Finally, J&J's subsidiaries

1

and agent paid kickbacks to Iraq in order to obtain contracts under the United Nations Oil

for Food Program ("Program") from 2000 to 2003.

3.      J&J violated Section 30A of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78dd-1] by making illicit payments to foreign

government officials in order to obtain or retain business.  J&J violated Section

13(b)(2)(B) of the Exchange Act by failing to have an adequate internal control system in

place to detect and prevent the illicit payments.  J&J violated Section 13(b)(2)(A) of the

Exchange Act by improperly recording each of those payments in its accounting books

and records.

## JURISDICTION

4.      This Court has jurisdiction over this action under Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  J&J, directly or

indirectly, made use of the means or instrumentalities of interstate commerce, of the

mails, or of the facilities of a national securities exchange in connection with the

transactions, acts, practices, and courses of business alleged in this Complaint.

5.      Venue is appropriate in this Court under Section 27 of the Exchange Act

[15 U.S.C. § 78aa] or 28 U.S.C. § 1391(d).

## DEFENDANT

6.      **Johnson & Johnson** ("J&J") is a global pharmaceutical, consumer

product, and medical device company headquartered in New Brunswick, NJ.  Its

securities are registered with the Commission under Section 12(b) of the Exchange Act,

and its common stock trades on the New York Stock Exchange under the symbol "JNJ."

J&J operates worldwide through more than 250 operating companies.  J&J and its

subsidiaries employ more than 100,000 people. In fiscal year 2009, its sales totaled $61.8 billion.

## RELATED ENTITIES

7.      **DePuy, Inc**. ("DePuy'), a Delaware corporation, is a surgical implant company that J&J acquired in November 1998. It is a wholly-owned subsidiary of J&J. DePuy is one of J&J's medical device businesses, and J&J continues to sell implants under the DePuy brand.

8.      **DePuy International, Ltd.** ("DPI") is a British corporation, headquartered in Leeds, England, and a wholly-owned subsidiary of J&J. DPI oversaw the sale of DePuy products in Greece.

9.      **"Greek Distributor"** was a Greek corporation owned by DPI's Greek Agent and was DPI's exclusive distributor in Greece. In January 2001, J&J purchased the Greek Distributor and renamed it DePuy Medec S.A. In mid-2003, it renamed the company **DePuy Helles S.A. ("DePuy Helles")**. In Greece, J&J sold surgical implants through DPI and then through DePuy Helles.

10.     **Johnson & Johnson Poland Sp. z.o.o.** ("MD&D Poland") is a Polish corporation and a wholly-owned subsidiary of J&J and sells medical devices in Poland.

11.     **Janssen-Cilag Eastern Europe** ("JC-EE") is an unincorporated organization within J&J that markets pharmaceutical products in southeastern Europe. It sells products in Romania through **Johnson & Johnson d.o.o.** ("Pharma Romania"), a Slovenian limited liability company.

12.    **Cilag AG International** ("Cilag"), a wholly-owned subsidiary, now known as Cilag GmBH International, is a provider of pharmaceutical products and is located in Schaffhausen, Switzerland.

13.    **Janssen Pharmaceutica N.V.** ("Janssen"), a wholly-owned subsidiary, is a provider of pharmaceutical products and is located in Beerse, Belgium.  J&J sold pharmaceutical products under the Oil for Food program through Cilag and Janssen.

14.    The financial results of each of the above J&J entities were a component of the consolidated financial statements included in J&J's filings with the Commission.

## FACTS

A.    Greece

15.    One of J&J's product lines is surgical implants such as artificial knees, hips and other products that surgeons implant into patients.  Surgical implants are a lucrative, but competitive business.  In many countries, orthopedic surgeons control which implants they use.

16.    In 1998, J&J acquired another medical device company, DePuy Inc., a NYSE company.  A top DePuy executive then went on to become a top J&J executive in the United States in J&J's medical device and diagnostics business ("Executive A").  At the time of the acquisition, DePuy was engaged in a widespread bribery scheme in Greece to sell its implants.  Executive A and DPI executives knowingly continued that scheme.  From 1998 to 2006, J&J earned $24,258,072 in profits on sales obtained through bribery.

### 1. Pre-J&J Bribery Scheme

17.     In 1997, DPI, a subsidiary of DePuy, hired a Greek individual (the "Greek Agent") to sell orthopedic implants in Greece.  The Greek Agent was well-known in the Greek orthopedic industry with long-standing relationships with surgeons.

18.     DPI executed two contracts to memorialize the deal.  In September 1997, DPI hired the Greek Agent's Greek company (the "Greek Distributor") as its exclusive sales agent.  Under that deal, the Greek Distributor agreed to market DePuy products in Greece and to pay DPI for products that it re-sold primarily to public hospitals.  A month later, DPI signed a separate contract with a private company in the Isle of Man (the "Private Company") owned by the Greek Agent in which DPI agreed to pay the Private Company a 25% commission on everything that the Greek Distributor purchased.  DPI paid the commission in the Isle of Man.

19.     The second contract said that the Private Company would provide marketing support to the Greek Distributor and DPI.  In fact, the contracts were a sham engineered to facilitate bribery.  DPI inflated the price it charged the Greek Distributor, then paid that "commission" to the Private Company.  The Private Company did not provide any significant services to DPI.  The Greek Agent used the commissions – which were raised to 35% by 1998 – to bribe publicly-employed doctors to use DePuy implants.

### 2. J&J Acquires DePuy And The Bribery Scheme Continues

20.     On November 5, 1998, J&J acquired DePuy.  As a result, J&J's Policy on Business Conduct (the "PBC") became effective over the DePuy organization.  The PBC prohibited the payment of bribes, required accurate books and records, and dictated controls over payments to third parties.

21.     After the merger, Executive A and DPI executives aware of the bribes continued the relationship with the Greek Agent.

22.     Beyond the DPI executives who knew about the payments to doctors, other DPI employees were aware of allegations that Greek doctors requested bribes as a means to supplement their public salaries. They were also aware that the Greek Agent had crucial relationships with Greek doctors and that those relationships were necessary in order to sell implants.

23.     After the merger, J&J executives learned that the Greek Agent was being paid through a private company in the Isle of Man. Those payments violated the PBC's policy requiring all agent payments be made in the country where the product was sold, i.e., in Greece. DPI executives were particularly concerned that the payments made out of country would raise red flags of bribery.

24.     By April 1999, certain J&J executives decided to stop the payments to the Private Company in the Isle of Man over the objections of Executive A. The DPI executives and others discussed the need to continue to funnel money to the Greek Agent for doctors that was equivalent to the Private Company's prior 35% "commission." For example,

- In a March 22, 1999 e-mail, an executive at J&J's existing operating company in Greece, J&J Medical Helles, cautioned his supervisor that the Greek Agent had "managed over the year to build off-shore accounts through various representations he has, which in turn helped him to have significant competitive advantage when dealing with Greek surgeons." The e-mail detailed instances that the executive characterized as "truly but a few" of the payments to Greek surgeons, including educational support.

- In a June 24, 1999 letter, a DPI attorney objected to a draft contract with the Greek Distributor because the 35% commission appeared to be a "bonus payment." In a letter sent to a DPI executive and copied to a J&J in-house counsel, the attorney said that the Greek Distributor was already

required to market DePuy products, and he warned that the executive who had drafted the arrangement could not explain how the money would be used to increase market share.

- In a March 13, 2000 status report, a DPI executive wrote that DPI planned to "pay a 30% sales commission to [the Greek Agent] (or a nominee company of his choice)" and that the Greek Agent "would take his personal remuneration and any other local support payments that he needed from this sum."

25.     In or about January 2000, the two DPI executives who dealt most-closely with the Greek business met with DPI's President and recommended that DPI terminate the Greek Agent because of the bribery. The DPI President raised the issue with his superior, Executive A, in late January 2000 during J&J's international sales conference.

26.     At the conference, three DPI executives met with Executive A, told him about the bribery, and recommended that DPI terminate the relationship with the Greek Distributor. However, the next day, Executive A and DPI's President met with representatives of the Greek Agent. Executive A offered to buy the Greek Distributor and to retain the Greek Agent as a consultant.

27.     In a subsequent e-mail, Executive A explained that DPI had considered terminating the Greek Distributor, but "[t]he only problem with the proposal was that we would lose half our business even by year 3." Executive A stated that "[t]o lose approximately $4m in sales in end user terms to the competition is totally unacceptable." Executive A added that two DPI executives who worked for him were "trying to find an alternative solution in order for us to acquire the [Greek Distributor] business retaining the sales and handling the in market customer practices."

28.     The DPI executives then met with the Greek Agent to discuss their future business arrangements. Executive A initially tried to reinstitute the payments in the Isle

of Man, but after a J&J attorney objected, Executive A allowed DPI to acquire the Greek

Distributor instead.

29.    In April 2000, a J&J executive based in Europe sent an e-mail to

Executive A noting that J&J took on risks by buying an existing company (as opposed to

just assets), but saying that the Isle of Man commission payments had been unacceptably

linked to the purchases of DePuy products by the Greek Distributor:

> The problem with these contracts for offshore payments has been and
> continues to be the "smell test" or the issue of substance plus our
> knowledge of what really happens.  In the case of [the Greek Distributor],
> we (or them) would face serious problems to come up with a substantiated
> services rendered for anything close to the amount paid (including mark-
> up), simply because only a small fraction (if any) is used for services and
> the bulk goes into the black hole.  The last item is my major concern for
> the latest option i.e. buying [the Greek Distributor] since, even with a
> thorough audit, we cannot know whether we will face future tax (and
> other) audits linking [the Greek Distributor], the owners and the Isle of
> Man payments.  By virtue of the previous contract, all three parties are
> linked and subject to potential liabilities.

30.    Through 2000, DPI followed Executive A's instructions and negotiated to

buy the Greek Distributor.  Those negotiations raised more red flags of bribery.  In

November 2000, a DPI lawyer and a DPI accountant circulated a draft due diligence

report saying that they had not seen evidence of bribery in the Greek Distributor's books

and could not determine whether the Greek Distributor engaged in these practices.

However, on the same day, the Greek Distributor's outside accountant e-mailed the DPI

financial executive that the Greek Distributor's inventory was overvalued by 35% and

would have to be adjusted after DPI's acquisition when the inventory was valued and

rolled up to J&J's books and records.  The e-mail noted that the Greek Distributor had

paid inflated prices to fund the payments to the Private Company and to cover "cash

incentives" that the Greek Agent paid.  The e-mail alerted the DPI accountant to the bribery, but he never changed his due diligence report.

31.     In fact, several DPI executives knew that "cash incentives" were not proper and that they were really bribes to doctors.  After the Greek Distributor's accountant sent a memo that noted that the Greek Agent needed money as soon as possible because he had to "pay cash incentives for sales up to the end of January 2001," a DPI vice president scolded him for mentioning the payments in writing:

> I [am] very disappointed to read in your proposal that it contains references to [the Greek Agent's] activities which cannot be mentioned in written correspondence with DePuy International.  I have made this point many times and each time it happens you put us in a very difficult position.

### 3.   Further Attempts To Conceal the Illicit Payments

32.     J&J finally closed DPI's acquisition of the Greek Distributor in January 2001 and eventually renamed it DePuy Helles.  The Greek Agent's associate became the head of DePuy Helles.  Rather than sever its ties to the Greek Agent, DePuy Helles continued to use him to facilitate bribe payments.

33.     DePuy Helles entered a consultant agreement, which paid the Greek Agent 27% of all sales in Greece.  However, in Spring 2001, DPI's outside accountants questioned the amount of the payments for tax reasons.  To conceal the true purpose and amount of payments subsequently made to the Greek Agent, the DPI executives split the payments between two new agreements with some payments paid by DPI and others paid by DePuy Helles.

34.     The bribe payments to doctors continued, and the Greek Agent and DPI executives often referred to them as "professional education" or "support."  The Greek

Agent wrote to DPI that "cash incentives to surgeons is common knowledge in Greece" and included charts that explicitly said the Greek Agent would be paid so that he could pay "support" to surgeons.  At one point, a DPI vice president e-mailed the head of DePuy Helles about a possible increase in payments to the Greek Agent "for increased direct payments to the surgeons."

35.     In October 2003, DPI dismissed the Greek Agent after months of disputes about the sales of surgical implants in Greece.  DPI hired another agent to fill the same role in the bribery scheme.

36.     In January 2005, a new EUCOMED Code of Business Practice went into effect, and a DPI vice president wrote the head of DePuy Helles and his supervisor:

> "Everyone in the industry is a million miles from applying the letter or spirit of the EUCOMED code!  Most industry players break every single rule in the book (support spouse travel, give non-medical gifts, etc.).  If we applied the letter and intent of the guidelines today, we'd lose 95% of our business by the end of the year."

37.     Throughout this time period, the Greek Agent and his replacement were occasionally late in paying doctors.  In those instances, DePuy Helles employees withdrew petty cash and paid the doctors directly.  From 2002 to 2006, records show about $590,000 in large, round-number withdrawals booked as "miscellaneous."  Those amounts were generally re-deposited to petty cash within days and were booked as "repayments."

38.     J&J's internal audit group discovered the payments to Greek doctors in early 2006 after receiving a whistleblower complaint.  The issue of payments to surgeons had been previously raised in an anonymous 2003 letter to a different internal audit team concerning a related J&J subsidiary in Greece.  However, that team concentrated their

investigation on allegations about a possible conflict of interest by local management and did not fully investigate the alleged payments to doctors.

**B.      Poland**

39.      Employees of MD&D Poland, a J&J subsidiary, bribed publicly-employed doctors and hospital administrators to obtain business.  MD&D Poland executives running three business lines oversaw the creation of sham contracts and travel documents and also the creation of slush funds as a means to funnel bribe payments to doctors and administrators.  From 2000 to 2006, J&J earned $4,348,000 in profit from its sales through the bribery.

40.      The bribery appears to have stopped when Polish prosecutors began to investigate payments to doctors.

**1.      Sham Civil Contracts**

41.      MD&D Poland created sham civil contracts with publicly-employed doctors and hospital administrators to pay them for using J&J's medical devices or for influencing hospitals to award medical device tenders to MD&D Poland.  Although the contracts called for services, the doctors would not provide any, and MD&D Poland would pay the doctors based on fictitious activities.

42.      Approximately $775,000 of improper civil contract payments were funneled to public doctors from at least January 1, 2000 to June 30, 2006.  In some cases, the amount paid to the doctor was a percentage of the value of a hospital tender.  In others, the amount was a flat fee requested by the doctor or hospital administrator.

43.      The payments to doctors were bribes to obtain and retain J&J business.  For example, a MD&D Poland employee sent an e-mail asking for the approval of a sham

civil contract with a hospital's healthcare director, noting that the doctor was "the key decision maker in the sutures tender for 2002, which will be concluded soon."  Similar e-mails accompanied other sham civil contracts as the basis for seeking approval for the sham arrangements by business managers.

44.     MD&D Poland had no internal controls in place that would have required supporting documentation be provided prior to making the payments to the doctors.  At least one high-level business manager and another executive in Poland were aware of and approved the illicit payments.

### 2. **False Travel Invoices**

45.     MD&D Poland also paid for public doctors and hospital administrators to travel to medical conventions in Poland and abroad in order to influence tender committee decisions in their favor.  Sponsored doctors were taken on trips in exchange for influencing the doctors' decisions to purchase J&J's medical products or to award hospital tenders to J&J.  Some of the trips were to the United States for conferences. Some of the trips were to tourists areas in Europe, and some included spouses and family members to what amounted to vacations.

46.     Business managers were allowed to approve lesser amounts for trips, but larger trips were approved by a managing director – all with an understanding that these expenditures were for the benefit of doctors who would influence tenders in MD&D Poland's favor.

47.     MD&D Poland employees also faked travel expenses in order to generate cash.  The money was then funneled to doctors as bribe payments.  For example, two MD&D franchises used a particular travel agency to funnel money to a senior Poland

Ministry of Health official with significant influence over a hospital.  A business manager directed his subordinates to submit approximately $147,000 in false travel invoices, which presumably was used to bribe doctors.  MD&D Poland spent approximately $7.6 million on these travel sponsorships between 2000 and 2006 that were rolled into the books of J&J with an indeterminate amount as bribes due to insufficient records.

C.    **Romania**

48.    Employees of J&J d.o.o. ("Pharma Romania"), a J&J subsidiary, bribed publicly-employed doctors and pharmacists to prescribe J&J products that the company was actively promoting (the "Promoted Products").  The employees worked with Pharma Romania's local distributors to deliver cash to publicly-employed doctors who ordered J&J drugs for their patients.  Pharma Romania also provided travel to certain doctors who agreed to prescribe J&J products.  From 2000 to 2007, J&J earned $3,515,500 in profit from its sales through the bribery.

49.    Pharma Romania used local distributors to sell J&J products to doctors and pharmacies in Romania.  Pharma Romania sales representatives worked with the distributors to generate cash that was paid to the doctors in exchange for the doctors prescribing Promoted Products.  The distributors obtained the cash to pay the doctors by receiving discounts on each invoice or by receiving free goods that the distributors could sell for profit to obtain extra cash.  Pharma Romania employees or the distributors would then deliver the cash to the doctors that were equal to 3-5% of the cost of the drugs that they prescribed.  The distributors would then work with the doctors and pharmacies to deliver the drugs to patients and receive payment for the drugs from the Romanian government insurance program.

50.     The scheme using travel benefits apparently began in late 2007 after J&J's internal audit began investigating claims of cash payments to doctors.  Pharma Romania employees stopped paying cash to doctors and began offering the doctors trips to medical congresses in return for the doctors prescribing Promoted Products.  In some cases, Pharma Romania employees had J&J's travel agents overcharge Pharma Romania for the trips in order to generate cash to pay for the doctors' families to attend the trips as vacations or to provide the doctors with "pocket money" while on the trips.

**D.    "Oil For Food" Transactions**

51.     The Oil for Food Program (the "Program") was intended to provide humanitarian relief for the Iraqi population, which faced severe hardship under the international trade sanctions that followed Iraq's 1990 invasion of Kuwait.  The Program permitted the Iraqi government to sell its crude oil and use the proceeds to purchase food, medicine, and critical infrastructure supplies.

52.     The proceeds of the oil sales were transferred directly from the buyers to an escrow account (the "U.N. Escrow Account") maintained in New York by the United Nations 661 Committee.  Funds in the U.N. Escrow Account were available for the purchase of humanitarian supplies, subject to U.N. approval and supervision.  The intent of this structure was to prevent the proceeds of Iraq's crude oil sales from undermining the sanctions regime by supplying cash to Saddam Hussein.

53.     Corruption was rampant within the Program.  By mid-2000, Iraqi ministries on the instruction of top government officials instituted a policy requiring suppliers of humanitarian goods to pay a ten percent kickback on each contract.  This kickback requirement was euphemistically referred to as an "after-sales service" fee;

however, no services were provided. Suppliers competing to obtain contracts under the Program were encouraged to include a ten percent markup in their bids or purchase orders.

54.     The inflated contract prices were incorporated into the Oil for Food contracts as a way to permit the suppliers to recover from the U.N. Escrow Account the kickback payments they had paid secretly to Iraq. Following the 2004 release of a report by the U.S. General Accounting Office exposing some of the abuses, the U.N. commissioned an independent inquiry committee, headed by former Federal Reserve Chairman Paul Volcker (the "Volcker Committee"), to investigate the Program's performance. That committee's October 27, 2005, final report estimated that the Iraqi government had diverted $1.7 billion in illicit income from the Program.

55.     J&J participated in the Program through two of its subsidiaries, Cilag AG International and Janssen Pharmaceutica N.V. (collectively "Janssen-Cilag"). During the program, Janssen-Cilag sold pharmaceuticals to an arm of the Iraqi Ministry of Health known as Kimadia. Janssen-Cilag conducted business with Kimadia in Iraq through a Lebanese agent (the "Agent"). The Agent's primary contact with the J&J companies was an area director at Janssen-Cilag's office in Lebanon.

56.     Prior to the time that Iraqi ministries began demanding kickbacks, the Agent received a twelve percent commission on sales in Iraq. In February 2001, several months after Kimadia started demanding kickbacks, Janssen-Cilag signed "side letters" with the Agent that raised his commissions on sales in Iraq by ten percent to twenty-two percent.

57.     The increase in the Agent's commissions was approved by a Janssen-Cilag area director in Lebanon as well as a managing director for Janssen-Cilag's Middle East West Asia ("MEWA") group in Belgium. The stated reason for the increase was so that the Agent could conduct "promotional activities" in Iraq. This commission increase allowed the Agent on behalf of Janssen-Cilag to pay the required ten percent kickbacks to the Iraqi ministries through the Agent and to mask the payments as legitimate agent commissions in the companies' books and records. Notably, the Agent was not able to provide detailed evidence or description of the purported promotional activities undertaken with his increased commissions, nor did the Company require such documentation.

58.     Following the March 2003 invasion of Iraq and the end of Kimadia's kickback demands, Janssen-Cilag no longer needed to pay extra commissions to the Agent to be used as kickbacks. Accordingly, Janssen-Cilag re-negotiated the commissions, decreasing them by ten percent. As with the prior change in commissions, the decrease was approved by a Janssen-Cilag area manager in Lebanon and a managing director in Janssen-Cilag's MEWA group. The Agent's contract with Janssen-Cilag was terminated once the scheme was uncovered.

59.     In total, secret kickback payments of approximately $857,387 were made in connection with nineteen Oil for Food contracts. The payments were made through the Agent to Iraqi controlled accounts in order to avoid detection by the U.N. The fee was effectively a bribe paid to the Iraqi regime, which were disguised on J&J's books and records by mischaracterizing the bribes as legitimate commissions.

60.    In order to generate funds to pay the bribes and to conceal those payments, Janssen-Cilag and its agent inflated the price of the contracts by at least ten percent before submitting them to the U.N. for approval.  J&J's total profits on the contracts were $6,106,255.

**E.    Anti-Bribery Violations**

61.    J&J, through its subsidiaries and agents, knowingly allowed its employees and third parties to pay Greek and Polish public doctors and public hospital administrators for the purpose of obtaining or retaining business.

62.    Executive A, a U.S. resident and a senior executive at J&J, approved the arrangements with the Greek Agent in Greece.  Executive A and DPI executives knew that the Greek Agent was bribing Greek doctors.  In addition, Polish doctors were bribed to use J&J products in return for trips.  Use of the mails and interstate commerce was also used to facilitate the bribery schemes in both Greece and Poland.

**F.    Failure To Maintain Its Books and Records**

63.    J&J's subsidiaries made numerous illicit payments for the purpose of obtaining contracts in Iraq, Romania, Greece, and Poland.  J&J's books and records did not reflect the true nature of those payments.  For example, they did not record that that a portion of its payments to the Greek and Iraqi agents constituted reimbursements for bribes, and they did not record the true terms of the civil contract payments to Polish doctors.  Efforts were made to obscure the purpose of trips to the United States and abroad.  Certain J&J subsidiaries created false contracts, invoices, and other documents to conceal the true business arrangement it had with its consultants and distributors to pay

bribes.  False travel documents were created, and petty cash was used to pay bribes.

United Nations contracts were also falsified.

### G.      Failure To Maintain Adequate Internal Controls

64.      J&J failed to implement internal controls to detect or prevent bribery. The
conduct was widespread in various markets, Greece, Poland, Romania, and Iraq.  The
conduct involved employees and managers of all levels.  False documents were routinely
created to conceal the bribery in each country.

65.      Rather than cease the bribery that was happening at DePuy prior to J&J's
acquisition, J&J through its subsidiaries, employees and agents allowed the bribery to
continue.  They created sham businesses and entered into contracts that were merely
conduits to allow the bribery to flourish.  They failed to conduct due diligence on the
Greek Distributor.  The Company also paid its consultant outside of Greece to avoid
detection of bribery. The Company had two different J&J corporate entities make
payments to the Greek Agent to conceal the amount of money that was being funneled to
doctors as bribes.

66.      MD&D Poland entered into fake civil contracts with Polish doctors and
J&J also created false travel arrangements in Poland and Romania to create slush funds.

67.      Cilag and Janssen paid bribes to Iraq despite the fact that trade sanctions
were in place against doing business in Iraq.  Cilag and Janssen falsified their contracts
with the United Nations to conceal the kickbacks being paid to Iraq.

## CLAIMS FOR RELIEF

## FIRST CLAIM

[Violations of Section 30A of the Exchange Act]

68.     Paragraphs 1 through 67 are realleged and incorporated by reference.

69.     As described above, J&J, through its officers, agents, and subsidiaries, corruptly offered, promised to pay, or authorized payments to one or more persons, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purpose of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their official duties, securing an improper advantage, or inducing such foreign officials to use their influence with foreign governments or instrumentalities thereof to assist J&J in obtaining or retaining business.

70.     By reason of the foregoing, J&J violated, and unless enjoined will continue to violate, Section 30A of the Exchange Act.  [15 U.S.C. § 78dd-1]

## SECOND CLAIM

**[Violations of Section 13(b)(2)(A) of the Exchange Act]**

71.     Paragraphs 1 through 70 are realleged and incorporated by reference.

72.     As described above, J&J, through its officers, agents and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

73.     By reason of the foregoing, J&J violated, and unless enjoined will continue to violate, Section 13(b)(2)(A) of the Exchange Act.  [15 U.S.C. § 78m(b)(2)(A)]

## THIRD CLAIM

### [Violations of Section 13(b)(2)(B) of the Exchange Act]

74.    Paragraphs 1 through 73 are realleged and incorporated by reference.

75.    As described above, J&J failed to devise and maintain a system of internal

accounting controls sufficient to provide reasonable assurances that: (i) transactions were

executed in accordance with management's general or specific authorization; and

(ii) transactions were recorded as necessary (I) to permit preparation of financial

statements in conformity with generally accepted accounting principles or any other

criteria applicable to such statements, and (II) to maintain accountability for its assets.

76.    By reason of the foregoing, J&J violated, and unless enjoined will

continue to violate, Section 13(b)(2)(B) of the Exchange Act.  [15 U.S.C.

§ 78m(b)(2)(B)]

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final

judgment:

A.    Permanently restraining and enjoining J&J from violating Sections 30A,

13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act  [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A),

and 78m(b)(2)(B)];

B.    Ordering J&J to disgorge ill-gotten gains wrongfully obtained as a result

of its illegal conduct; and

C.      Granting such further relief as the Court may deem just and appropriate.

Dated: _____April 8_____, 2011.

Respectfully submitted,

_____

Cheryl J. Scarboro (D.C. Bar No. 422175)
Tracy L. Price
Reid A. Muoio
Kelly G. Kilroy
Brent S. Mitchell

Attorneys for Plaintiff,
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC  20549
(202) 551-4403 (Scarboro)